GREENCASTLE · TOWNSHIP IN PUTNAM COUNTY and KER-
CHEVAL, County Treasurer, &c., *v.* BLACK.

ON PETITION for a Rehearing.

STUART, J.—The facts and pleadings so fully appear in
the former opinion, that it is not necessary to repeat them.
The case was twice elaborately argued, once on printed
brief when submitted, and afterwards orally.

Judge *Hovey,* who delivered the opinion of the Court on
that occasion, being no longer on the bench, it is not im-
proper to say that his position as a distinguished member
of the constitutional convention, justly imparted great
weight to his opinions on questions of constitutional con-
struction.

The petition for a rehearing respectfully reviews the
positions of the Court, and ingeniously points out what
are conceived to be errors in coming to the conclusions
announced. To a question of such magnitude, it is natu-
ral that the public attention should be directed. The im-
portant interests involved and the feeling excited render it
highly proper that we should carefully review our former
ruling.

It is due, perhaps, for another reason. Feelings not very
favorable to the candid discussion of abstract questions
have been invoked. A co-ordinate department, with what
degree of taste or propriety does not become us to say, has
officially questioned the correctness of the decisions in the
school cases. It can not, therefore, fail to be more satisfac-
tory to the parties, and to the public, that we re-examine
the question on its merits, without much regard to the

course of reasoning adopted on the former occasion, or that pursued by counsel.

In order more accurately to mark the path of inquiry, it is proposed to examine:

1. The rule of construction applicable to written constitutions.

2. The constitutional provisions on the subject of common schools, gratuitous tuition, and school tax.

3. Whether the school law is, in these respects, conformed to the constitution.

Preliminary to these inquiries, a few explanatory observations seem to be demanded.

We are fully aware that to declare an act which treats of schools, (a subject so closely interwoven with the interests and feelings of society), unconstitutional, is to assume the gravest responsibility. Still, when such questions are presented, they must be met. Parties urge a decision, and we have no means of escape. It is not a crisis of our seeking, but one forced upon us in the regular course of judicial duty. When such a question does arise, it is surely not the first duty of the Courts to tax their ingenuity to explain away the constitution, in order to accommodate a favorite theory. If there be any form of words which should be held sacred, it is the plain language of the fundamental law. "It is the rule and commission by which both legislators and judges are to proceed." 2 Dallas 304. The Courts dare not deal with that instrument in a "double sense." In giving it construction, they must not bend to any outside pressure, real or simulated. Such judicial delinquency would inflict infinitely more serious evils than any temporary inconvenience which may flow from adherence to the terms of the constitution.

A correct solution of the school questions has been a subject of anxious solicitude with the Court. They would gladly have received light from any legitimate source. At the instance of the judges, the cause was argued orally in addition to the printed briefs. They were deeply sensible that the construction of an instrument adopted with such unanimity by the people, because it was supposed capa-

Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

ble of shedding its blessings and protection over all, was among the very gravest of judicial duties. Others may look at such questions through mediums tinged, and consequently perverted, with pecuniary, political, or educational considerations. Not so with the Courts. Their vision is bounded by authority; their path of inquiry hedged in with rules of judicial construction. To disturb these rules, is to unsettle everything. Beyond them it is seldom the Courts can either safely or properly penetrate. "They must be governed by the principle of law, and not by the hardship of any particular case." When the rule of law is plain, no matter how cogent the reasoning from other sources may be, the argument from inconvenience is wholly inadmissible. The rule must, in such cases, be applied without regard to what interests may thereby be built up, or what prostrated.

Men who reason on such questions, not from principles, but results, are but poorly fitted to solve constitutional difficulties. Of course, their praise or censure, for such reasons, must always be a matter of equal indifference. Strictures predicated upon consequences, besides the doubtful quality of their taste and logic, proceed upon two very grave mistakes. The one is, that the people are not sufficiently intelligent to understand the true issue; the other, that the judges can be overawed in the discharge of their public duty. And yet it would be the greatest misfortune to the people of the state, if the judges could be thus intimidated. It requires but a moment's pause to estimate the evils of a pliant judiciary, and the necessity of judicial independence. That very independence which, adhering strictly to principle, conflicts with the real or fancied interests of to-day, may be their only shield from destruction to-morrow. Whoever looks thus to expediency only in legal questions, must often find himself in opposition to the Courts.

That we have not been needlessly refining in constitutional construction, is clearly shown, we think, by the authorities. We proceed then to the first inquiry.

1. What is the rule of construction applicable to written constitutions?

Nov. Term, 1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

*Newell* v. *The People,* 3 Selden 9, is a very important and instructive case on this subject. It is of recent date (*May,* 1852). The signal ability with which it is discussed, both by counsel and the Court, makes it the leading case, embracing the modern learning on the construction of written constitutions.

The facts were these:

The constitution of the state of *New-York* of 1846, authorized the surplus revenues of the canals to be applied in each fiscal year to their enlargement, in such manner as the legislature should direct. The state was prohibited from contracting a debt, save for certain specified purposes, and to a limited amount (one million). The act of 1851 assumed to authorize the issuing of certificates to the amount of 9,000,000 dollars, for the redemption of which the annual surplus revenues of the canals were pledged. In short, the law, instead of expending the revenues annually, each fiscal year, as they accrued, anticipated them, in order to enlarge the works more speedily; and pledged the surplus revenues for the payment of these anticipations. And the question was, could the revenues be thus anticipated, consistently with the constitution?

It was admitted on all hands that the speedy enlargement of the canals was a matter of urgent public necessity, to accommodate the increased business. It was further plausibly urged that the surplus revenues of the canals were still set apart for their enlargement. That the manner in which they were to be applied was given unrestrictedly to the discretion of the legislature. That this anticipation was a proper application of that fund. That the nine millions was not a debt borrowed on the credit of the state, but on the credit of that fund. And that, therefore, it was in conformity with the plan for finishing these works, prescribed by the constitution.

But the Court held that the act contravened, among other things, the constitutional provision requiring the remainder of the canal revenues to be applied in each fiscal

Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

year, and also the provision prohibiting the state from contracting a debt.

The law has its maxims which are to be granted without argument or discourse. 1 Inst. 16. In the arguments of counsel and the opinions of the judges, in the *Newell* case, the legal maxims bearing on the construction of written constitutions are collected. Though gleaned mostly from *American* authorities, they were treated as settled beyond the reach of discussion. And well they might be, considering the sources from which they emanated, and the obvious correctness of the principles announced.

Thus it was urged in argument, and so held by the judges, that the discretion of Courts is more restricted in applying the rules of construction to a plan of government contained in a written constitution, than in the construction of statutes. And the reason is conclusive. Statutes are often hastily and unskilfully drawn, and thus need construction to make them sensible. But constitutions import the utmost discrimination in the use of language. "They are the permanent will of the people, intended for the guidance of posterity." Thus, *Marshall*, C. J., in relation to the Constitution of the *United States*: "The framers of the constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they said." *Gibbons* v. *Ogden*, 9 Wheat. 188.

So the dissenting opinion of *Bronson*, J., in *The People* v. *Purdy*, 2 Hill 31, subsequently declared in the Court of Errors to be the law, and cited with marked approbation in *Newell* v. *The People*. "Written constitutions will soon become of little value, if their injunctions may be lightly overlooked; and the experiment of setting a boundary to power will prove a failure."

Again, in the same case, the Court of Errors, in reversing the judgment of the Supreme Court, and adopting the dissenting opinion of *Bronson*, J., say: "If the Courts venture to substitute for the clear language of the instrument, their own notions of what it should have been, or was intended to be, there will be an end of written constitutions." *Purdy*

Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

v. *The People*, 4 Hill 384. In construing the language of the constitution, Courts have nothing to do with the argument from inconvenience. Their sole duty is to declare, *ita lex scripta est*—thus saith the constitution. 21 Wend. 584.

These may be regarded as well-settled legal maxims, governing the construction of written constitutions. Keeping these maxims in view, let us inquire:

2. What are the constitutional provisions on the subject of common schools, gratuitous tuition, and school tax?

The constitution enjoins on the legislature, "to provide by law for a general and uniform system of common schools, wherein tuition shall be without charge, and equally open to all." Section 1, article 8.

The chief duty here enjoined, viz., that "tuition is to be without charge," is specially noticeable. To enable the state to discharge this duty, all the trust funds are consolidated into what is called the "common school fund," the income of which is inviolably appropriated to the support of common schools. Sections 2, 3, article 8. Had there been no fund provided, the power of taxation to accomplish the object would necessarily be implied.

Should the fund provided prove insufficient, the same rule applies. To supply whatever may be needed beyond the income of the common school fund, the power and duty to levy a tax are equally clear.

Common schools are thus to be established as a state institution, under the superintendent of public instruction, as its official head (section 8, article 8), and to be supported as to *tuition* by state funds.

In the mode of levying tax, however, the state is restricted. Taxes for school purposes can not be levied by local or special law. Section 22, article 4. They must be levied by general law, of uniform operation throughout the state. Section 23, article 4. And upon a uniform and equal rate of assessment and taxation. Section 1, article 10. These restrictions the people have deemed it expedient to impose on the legislature. It is not our purpose to inquire into their policy. That they are part of the fun-

Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

damental law, is enough for us. It becomes us to see that they are not impaired. The language is plain, clear, and consistent. If these restrictions can be explained away or evaded, then "it may be set down as an established fact, that the *English* language is too poor to frame fundamental laws which shall limit the powers of the legislature."

We come then to the last inquiry, viz.:

3. Whether the 130th section of the school law, as to the mode of levying tax and paying tuition, is in conformity to the constitution?

We thus confine it to the single points of *tuition* and *tax*, for the sake of perspicuity. The other parts of the section can hardly be said to be before us; nor have we, consequently, examined how far they may be affected by the ruling in the *Maize* case. At all events, if the tax in this case is vicious for any purpose, it being inseparable, vitiates the whole section.

The school law, section 130, as to tax and tuition, provides that the voters of any township shall have power, at any general or special meeting, to vote a tax, &c., for continuing their schools after the public funds shall have been expended, &c.

We now deal solely with the tax as a common school fund. Keeping in mind the obligation of the state to furnish tuition free, was the tax voted by *Greencastle* township a constitutional mode of discharging that duty? We are very clear that it was not.

That the tax so levied is a township tax, in contradistinction to a state tax, needs no illustration. This distinction is recognized in the constitution. Section 22, article 4. It is a tax levied in the township by the voters, upon the property and polls of the township. It is, therefore, strictly a township tax.

How is this tax to be appropriated? The purpose is, to continue the schools in *Greencastle* township after the public funds have been exhausted. This "continued school" either belongs to the common school system, or it is independent. If it belongs to the state system, then here is a state school supported, not by common school funds, but

Nov. Term, 1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

by township tax. It is not a state tax, levied on all the property of the state; but a specific and local tax, levied by vote, for the support of that part of the common school system embraced in *Greencastle* township. Tuition is not without charge, it is not paid by the state, nor out of state or common school funds. The people of *Greencastle* township pay the tuition, over and above their proportion of the state tax for common school purposes. It is a discriminating tax on the property and polls of *Greencastle* township.

The 130th section of the law levying such a tax for such a purpose, is in direct conflict with the express terms of the constitution, and void.

But it may be said that the "continued school," after the public funds have been expended, does not belong to the common school system, but is a private school, independent of the system. The definition is accepted; and what then? It conflicts with another section of the constitution. It was formerly not uncommon to find an insurance company chartered, or attempted to be, under the modest title of a state road. To prevent such legislation, the convention adopted the 19th section, article 4. "Every act shall embrace but one subject, and matters properly connected therewith. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only for so much thereof as shall not be expressed in the title." The title of the school law is, "An act to provide for a general system of common schools and school libraries, and matters properly connected therewith." This title does not embrace independent schools; nor, if it did, are they matters properly connected therewith. The very idea of an independent school is that of a school unconnected with any system. On the hypothesis, then, that it is an independent school, it is a distinct subject-matter embraced in the act, but not expressed in the title, nor properly connected with the school system. It is therefore clearly in conflict with section 19, article 4, and void.

Taking the rules of construction and the constitution in the one hand, and the law in the other, the result is more

Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

strongly marked than in the *Newell* case.   Thus, whether it be regarded as a tax to support the state system, or a tax to support an independent school, it is equally unconstitutional.   Of this we are clear beyond all doubt.   In such a case of incompatibility between the law and the constitution, "the Court would be unworthy of its station, if it could be unmindful of the high obligation which that station imposes."

Nor does this conclusion as to the invalidity of the law, imply any disrespect to any other department.   *Newell* v. *The People, supra.*

The uniformity of the laws, as required by the constitution, is easily understood.   That no law can be devised to operate uniformly in all respects, is quite clear.   A school in the city, and in the rural districts, would be a very different thing, under any law.   School houses could not be built in different localities, of the same size and material, for the same price.   But there is. a wide distinction between that want of uniformity incident to different circumstances, and that want of uniformity created by the law itself.   When the state has raised a common school fund by uniform assessment and taxation, she has attained the contemplated uniformity in that respect.   When she has distributed the fund equally to all entitled to it, she has attained uniformity in that respect; and so of everything else in which uniformity is attainable.

But when a tax is levied in one township for common school purposes, which is not a state tax, and may not be so levied on the taxable property of the state, the law itself creates the want of uniformity.   Such diversity, where uniformity is attainable, is in violation of the constitution. The meaning of the instrument is plain.   The burdens to support the system must be apportioned, and the funds distributed generally and uniformly to all.

Another source of confusion and cavil is the similarity of the restriction upon the levy of county and school tax, in section 22, article 4.   But it is overlooked that the state is not bound to levy a state tax to defray the county ex-

Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

penses. Article 6. She is so bound as to the tuition in her common schools. Section 1, article 8.

It is impliedly affirmed in what has been said, that the state may by tax provide public funds to any extent she thinks proper. She now levies 10 cents; she may make it 10 dollars on the hundred. Her power to do so is a necessary sequence.

On the subject of popular voting on laws—in this instance voting a tax—we have nothing to add to what was said in the *Maize* case. We believe the theory of such voting unsound and untenable, and the reasoning of the Court in the case of *The State of Vermont* v. *Parks*, in which such voting is sought to be vindicated, seems to us wholly inconclusive. It leaves out of view the idea of a representative system as *the* system. If to that be added the restrictions of our own constitution, we think the question closed as to the policy of this state. In the case under consideration, the voters are authorized to vote a tax. It is claimed as a popular right. If that be admitted, then carry out the principle. If the voters of the township have such a right, so have the voters of the county, so have the voters of the state; and if on one species of tax, so on every other; and if on tax questions, then on all questions. The theory of our constitution is representative. The people of the townships act by trustees, or other local officers; the people of the county, by their county board; the people of the state, by the legislative, judicial, and executive departments. Thus the laws operating in counties and townships become efficient commands, and rules of civil action —not mere permissions, to be disregarded or otherwise, as the voters may choose to vote. In electing members of the general assembly, the people are all heard upon every subject. The executive officers of the state, the counties, and the townships, carry out whatever general laws the wisdom of the assembly has devised. Thus the people speak, but under the constitution it is through their representatives.

With singular incongruity, this very school bill, which, contrary to the constitution, confers the popular right of

Nov. Term,
1854.

GREENCAS-
TLE TOWN-
SHIP, &c.
v.
BLACK.

voting a tax, takes away from the inhabitants, not only the control of their township school fund, but appropriates the whole fund itself. The voting is treated as the theoretical idea, the diversion of the township fund the practical illustration of local popular rights. The fund wisely donated as a permanent basis for local popular action and control in each congressional township, is blotted out. To seal the matter, so that the "murder may not out," it is even attempted to take away the private corporate powers of the inhabitants. And the Courts are upbraided in high places, for upholding the constitution and the public faith against such pernicious policy.

The great difficulty seems to arise from the restrictions in the constitution. It is said, for example, that city and county taxes come under the same restriction as local taxes for common schools. We have already alluded incidentally to this objection, in answer to the argument of counsel. In addition, we may observe, that we do not readily see how any fair inquirer could arrive at that result. It is quite certain we have not intimated anything of the kind. The constitution recognizes, in various ways, counties, county boards, cities, and other municipal corporations, as then existing institutions. Of this class is article 6; so, also, more or less directly, sections 6 and 22, article 4; section 3, article 7; sections 4, 5, 6, article 8; section 3, article 9; section 6, article 10; sections 13, 14, article 11; section 7, article 15. The 3d and 4th clauses of the schedule expressly continue municipal corporations, until modified or repealed by the general assembly. But nowhere is it enjoined or implied, that the state shall defray the expenses of these corporations. She is bound, as before observed, to institute a system of common schools wherein tuition shall be without charge.

Yet if the provisions of the constitution were imperative on the state in regard to the expenses of municipal corporations, what could be done? If it were expressly declared, or necessarily implied, that all taxes for county and city purposes should be assessed and collected as state tax, it is not easy to see how the constitution could be super-

seded either by the legislature or the Courts, even with the aid of the executive.    It would still be the duty of all to obey, and of the Courts to uphold and adhere to its plain meaning.

If the restrictions imposed be found impracticable, it belongs solely to the people to modify or change them.    It is not meet that the Courts should effect a change by construction and evasion.    But these restrictions, being new, do not yet work smoothly.    Besides, the wild latitude of former legislation being kept in view, perhaps the parties restrained are a little restive.    However that may be, these restrictions were imposed deliberately, and for a purpose. They are the barriers erected by the people against the encroachment of the power they have delegated.    The people will therefore be slow to remove them—leaving it to time to vindicate the wisdom and profound policy of the checks thus imposed.·  For these reasons the petition for a rehearing must be overruled.

GOOKINS, J., was absent.

*Per Curiam.*—The Petition for a rehearing is overruled.