MADERA WATERWORKS v. CITY OF MADERA et al.

(Circuit Court, S. D. California, N. D.   September 12, 1910.)

No. 170.

**1. Waters and Water Courses (§ 192*)—Water Companies—Rights Under Franchise.**

    The franchise of a water company to occupy and use the streets of a city must necessarily rest in a grant from the state, and the measure of its rights is to be determined from a construction of such grant purely as a matter of contract.

    [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 279; Dec. Dig. § 192.*]

**2. Franchises (§ 2*)—Construction of Grant.**

    The public grant of a franchise, whether by a Constitution, statute, or municipal ordinance, is to be strictly construed in favor of the public, and nothing passes by implication.

    [Ed. Note.—For other cases, see Franchises, Cent. Dig. § 2; Dec. Dig. § 2.*]

**3. Waters and Water Courses (§ 192*)—Franchise of Water Company—Construction.**

    Const. Cal. art. 11, § 19, which provides that, in any city not itself operating works for supplying water or light to its inhabitants, any person or corporation organized under the laws of the state shall have the privilege of using the streets for the purpose of constructing and operating such works, subject to municipal regulation, does not grant an exclusive franchise to a corporation constructing waterworks thereunder, nor can such exclusive right be implied, and its rights are not violated by the construction and operation of competing works by the city.

    [Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 279; Dec. Dig. § 192.*]

In Equity. Suit by the Madera Waterworks against the City of Madera and others. On demurrer to bill. Demurrer sustained.

Frank H. Short, F. E. Cook, and E. J. McCutchen, for complainant.

Raleigh E. Rhodes and N. C. Coldwell, for defendant.

Percy V. Long, City Atty., and Thomas E. Haven and John T. Nourse, Asst. City Attys., amici curiæ.

WELLBORN, District Judge. Circumstances which I could not well control have prevented me from giving to this case the prompt consideration which it otherwise would have received.

At the oral argument, Mr. McCutchen submitted, and his printed brief subsequently filed contains, the following abstract:

"The question, however, is a simple one. It is whether, after private capital has, in a city where there are no public works, occupied the streets and thoroughfares for the purposes of supplying the city and its inhabitants with water under the section of the Constitution to which your honor's attention has been directed, the city itself may, while the privately owned plant is engaged in the business of supplying the municipality and its inhabitants with water, install a plant and operate it in competition with the privately owned plant."

This paragraph, although brief, is comprehensive, and dispenses with a statement of the case. To the facts, which it implies, however,

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

may be added, quoting from page 19 of defendants' brief filed August 19, 1909, the following:

"That the General Assembly of this state has, by statute, conferred upon the city of Madera the power of installing this contemplated system of municipal waterworks, is not denied by the complainant, and the case presented in the amended bill of complaint, and all of the argument so far made in support of that case, proceeds upon the admitted fact that the Legislature has given, or attempted to give, such authority. It is alleged and argued that the acts of the Legislature purporting to give to the city this authority are null and void because unconstitutional. That they are an infraction of the Constitution as they were passed in an attempted exercise of a legislative power not vested in the General Assembly, but taken from it. It is alleged and argued that this limitation upon the legislative power of the General Assembly is found in section 19 of article 11 and article 14 of the state Constitution. It is not asserted or claimed that those sections contain any express limitation of the legislative power. The contention is that this limitation upon the power of the General Assembly arises by implication."

Complainant, in its reply brief filed September 10, 1909, at page 18, seems to accept this as a correct statement of the matter to which it refers, and I shall, accordingly, do the same.

Section 19 of article 11, above referred to, is as follows:

"In any city where there are no public works owned and controlled by the municipality for supplying the same with water or artificial light, any individual, or any company duly incorporated for such purpose, under and by authority of the laws of this state, shall, under and by authority of the superintendent of streets, or other officer in control thereof, and under such general regulations as the municipality may prescribe, for damages and indemnity for damages, have the privilege of using the public streets and thoroughfares thereof, and of laying down pipes and conduits therein, and connections therewith, so far as may be necessary for introducing into and supplying such city and its inhabitants either with gaslight, or other illuminating light, or with fresh water for domestic and all other purposes, upon the condition that the municipal government shall have the right to regulate the charges thereof."

The other parts of the Constitution, which it is claimed bear on the subject, stated in the order in which Mr. McCutchen's brief arranges them, are article 14, article 12, § 10, and article 13, § 1.

Complainant's franchise to occupy and use the streets of the city of Madera must necessarily rest in a grant from the state. There is no other conceivable source from whch it could emanate, and it follows, as the simplest of corollaries, that the nature and extent of the franchise is determinable from the grant, and that no action by the state, unless it entrenches upon the franchise so determined, can be justly characterized as "contrary to natural rights," "subversive of fundamental principles," or "violative of constitutional provisions." All efforts, therefore, to pitch the controversy on any other than a contractual plane, must be unavailing. Nor does the claim that section 19 of article 11 should be treated as a provision fixing a state policy help at all to a decision of the case. Indeed, this contention, instead of clarifying, only removes a step further from view, and thus tends to obscure, the point at issue. If it be conceded that said section embodies the declaration of a public policy, still it is, both in form and substance, the offer of a special privilege, which, when duly accepted, becomes a binding agreement, and hence, whether or not complainant's franchise so acquired is exclusive as against the city of Madera

is purely a matter of contract, to be determined by applying to the section appropriate rules of construction.

With this understanding of the controversy, there is little need to do more than quote the following authoritative utterances from the Circuit Court of Appeals of this Circuit, speaking through Judge Ross:

"The plain and complete answer to the appellant's contention is that, by the contract upon which it relies, the city did not agree not to establish a water system of its own for the supplying of the city and its inhabitants with water. Not only is there no express agreement to that effect, but there is not a word or a syllable in the contract even tending in that direction; and, even if there was, the law is that a municipality cannot exclude itself from competition in such a matter by mere implication, for 'we are to remember,' said the Supreme Court, in the very recent case of Vicksburg v. Vicksburg Water Co. [202 U. S. 453] 26 Sup. Ct. 660 [50 L. Ed. 1102], 'the well-established rule in this court which requires grants of franchises and special privileges to be most strongly construed in favor of the public, and that, where the privilege claimed is doubtful, nothing is to be taken by mere implication as against public rights. This rule has been applied to a series of contracts in waterworks and land cases, and we have no disposition to detract from its force and effect, and, unless the city has excluded itself in plain and explicit terms from competition with the waterworks company during the period of its contract, it cannot be held to have done so by mere implication.' There is not in the contract here in question any exclusive privilege granted to the predecessor in interest of the complainant, even as against any other individual company, or corporation. The case above cited, and those of Helena Waterworks v. Helena, 195 U. S. 383 [25 Sup. Ct. 40, 49 L. Ed. 245]; Joplin v. Light Co., 191 U. S. 150 [24 Sup. Ct. 43, 48 L. Ed. 127]; Skaneateles Water Company v. Skaneateles, 184 U. S. 354 [22 Sup. Ct. 400, 46 L. Ed. 585]; Bienville Water Supply Co. v. Mobile, 175 U. S. 109 [20 Sup. Ct. 40, 44 L. Ed. 92]; and Long Island Water Supply Co. v. Brooklyn, 166 U. S. 685 [17 Sup. Ct. 718, 41 L. Ed. 1165]—are conclusive against the appellant, and leave nothing more to be said." Tillamook Water Co. v. Tillamook City, 150 Fed. 117, 119, 80 C. C. A. 71, 73.

The opinion of Judge Gilbert, on the hearing of this case in the Circuit Court, is also a clear statement of the law, and I quote therefrom as follows:

"The question presented by the demurrer is whether the city of Tillamook, by proceeding to construct and maintain a system of waterworks for the purpose of furnishing water to the city and its inhabitants, will impair the obligation of its contract with the complainant. It is not disputed that the municipality is given by the law the authority to create, own, and maintain a system of waterworks. The whole question depends upon the nature of its contract with the complainant. There can be no doubt that the grant of an exclusive privilege to a water company to lay water pipes and furnish the inhabitants of a city with water for a stated period of time, accepted and acted upon by the company, is the grant of a franchise given in consideration of the performance of a public service, and is protected against hostile legislation by the state and by the municipality. New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650 [6 Sup. Ct. 252, 29 L. Ed. 516]; New Orleans Water Co. v. Rivers, 115 U. S. 674 [6 Sup. Ct. 273, 29 L. Ed. 525]; St. Tammany Waterworks v. New Orleans Waterworks, 120 U. S. 64 [7 Sup. Ct. 405, 30 L. Ed. 563]. Nor can there be any doubt that, if a municipality has covenanted that during the life of the privilege it will not institute works of its own, it would be an impairment of the obligation of its contract to institute, before the expiration of that period, a waterworks system, to be owned and operated by the municipality. Walla Walla v. Walla Walla Water Co., 172 U. S. 1 [19 Sup. Ct. 77, 43 L. Ed. 341]. But the city of Tillamook gave to the complainant's grantor no exclusive privilege or franchise, nor

did it consent, as in the Walla Walla Water Case, that it would not erect, maintain, or become interested in any other waterworks. The principles which must control the decision of the present case are to be found in Charles River Bridge Co. v. Warren Bridge Co., 11 Pet. 420 [9 L. Ed. 773]; Long Island Water Supply Co. v. Brooklyn, 166 U. S. 685 [17 Sup. Ct. 718, 41 L. Ed. 1165]; Bienville Water Supply Co. v. Mobile, 175 U. S. 109 [20 Sup. Ct. 40, 44 L. Ed. 92]; Skaneateles Water Co. v. Skaneateles, 184 U. S. 354 [22 Sup. Ct. 400, 46 L. Ed. 585]; Joplin v. Light Co., 191 U. S. 150 [24 Sup. Ct. 43, 48 L. Ed. 127]; and Helena Waterworks v. Helena, 195 U. S. 383 [25 Sup. Ct. 40, 49 L. Ed. 245]." Tillamook Water Co. v. Tillamook City, 139 Fed. 406.

To the authorities cited in the above opinions of Judges Ross and Gilbert should be added Knoxville Water Company v. Knoxville, 200 U. S. 22, 37, 26 Sup. Ct. 224, 226 (50 L. Ed. 353), which was decided after Judge Gilbert's opinion was rendered. In the Knoxville Case the court says:

"The present suit was brought upon the theory that the legislative enactments of 1903 were laws impairing the obligations of the contract of 1882 between the water company and the city, as well as upon the theory that the maintenance by the city of a system of waterworks in competition with those of the water company would inevitably destroy the value of the latter's property, and be a taking, under the sanction of the state, of the company's property for public use without compensation, in violation of the due process of law enjoined by the fourteenth amendment."

Thus, it will be seen that the Knoxville Case and the one at bar are substantially alike in their issues; the main difference being that here the contract is evidenced by a constitutional provision, and there by an ordinary written agreement between the municipality and the water company. This difference, however, is immaterial so far as concerns the matter of interpretation, and the court, at page 34 of 200 U. S., at page 228 of 26 Sup. Ct. (50 L. Ed. 353), so declares in the following language:

"It is true that the cases to which we have referred involved in the main construction of legislative enactments. But the principles they announce apply with full force to ordinances and contracts by municipal corporations in respect of matters that concern the public. The authorities are all agreed that a municipal corporation, when exerting its functions for the general good, is not to be shorn of its powers by mere implication. If by contract or otherwise it may, in particular circumstances, restrict the exercise of its public powers, the intention to do so must be manifest by words so clear as not to admit of two different or inconsistent meanings."

At page 31 of 200 U. S., at page 229 of 26 Sup. Ct. (50 L. Ed. 353), the court further says:

"It is, we think, important that the courts should adhere firmly to the salutary doctrine, underlying the whole law of municipal corporations and the doctrines of the adjudged cases, that grants of special privileges affecting the general interests are to be liberally construed in favor of the public, and that no public body, charged with public duties, be held upon mere implication or presumption to have divested itself of its powers."

In Charles River Bridge Company v. Warren Bridge Company, 11 Pet. (36 U. S.) 420, 543, 9 L. Ed. 773 (underscoring mine), the Chief Justice, speaking for the court, said:

"This brings us to the act of the Legislature of Massachusetts of 1785, by which the plaintiffs were incorporated by the name of the 'Proprietors of the Charles River Bridge'; and it is here, and in the law of 1792, prolonging

their charter. that we must look for the 'extent and nature of the franchise conferred upon the plaintiffs. Much has been said in the argument of the principles of construction by which the law is to be expounded, and what undertakings, on the part of the state, may be implied. The court think there can be no serious difficulty on that head. It is the grant of certain franchises, by the public, to a private corporation. and in a matter where the public interest is concerned. The rule of construction in such cases is well settled, both in England, and by the decisions of our own tribunals. In the case of the Proprietors of the Strowbridge Canal v. Wheeley and Others, 2 B. & Ad. 793, the court say: 'The canal having been made under an act of Parliament, the rights of the plaintiffs are derived entirely from that act. This, like many other cases, is a bargain between a company of adventurers and the public, the terms of which are expressed in the statute; and the rule of construction in all such cases is now fully established to be this: That any ambiguity in the terms of the contract must operate against the adventurers, and in favor of the public, and the plaintiffs can claim nothing that is not clearly given them by the act.' And the doctrine thus laid down is abundantly sustained by the authorities referred to in this decision. The case itself was as strong a one as could well be imagined, for giving to the canal company, by implication. a right to the tolls they demanded. Their canal had been used by the defendants, to a very considerable extent, in transporting large quantities of coal. The rights of all persons to navigate the canal were expressly secured by the act of Parliament: so that the company could not prevent them from using it. and toll demanded was admitted to be reasonable. Yet, as they only used one of the levels of the canal, and did not pass through the locks, and the statute, in giving them the right to exact toll, had given it for articles which passed 'through any one or more of the locks,' and had said nothing as to toll for navigating one of the levels, the court held that the right to demand toll. in the latter case, could not be implied, and that the company were not entitled to recover it. *This was a fair case for an equitable construction of the act of incorporation, and for an implied grant, if such a rule of construction could ever be permitted in a law of that description.* For the canal had been made at the expense of the company; the defendants had availed themselves of the fruits of their labors, and used the canal freely and extensively for their own profit. *Still the right to exact toll could not be implied, because such a privilege was not found in the charter.*

"Borrowing, as we have done, our system of jurisprudence from the English law, and having adopted. in every other case, civil and criminal, its rules for the construction of statutes, is there anything in our local situation, or in the nature of our political institutions, which should lead us to depart from the principle, where corporations are concerned? Are we to apply to acts of incorporation a rule of construction differing from that of the English law, and, by implication, make the terms of a charter, in one of the states, more unfavorable to the public than upon an act of Parliament, framed in the same words, would be sanctioned in an English court? Can any good reason be assigned. for excepting this particular class of cases from the operation of the' general principle; and for introducing a new and adverse rule of construction, in favor of corporations, while we adopt and adhere to the rules of construction known to the English common law, in every other case, without exception? We think not: and it would present a singular spectacle. if, while the courts in England are restraining, within the strictest limits, the spirit of monopoly, and exclusive privileges in nature of monopolies, and confining corporations to the privileges plainly given to them in their charter, the courts of this country should be found enlarging these privileges by implication, and construing a statute more unfavorably to the public. and to the rights of community, than would be done in a like case in an English court of justice.   *   *   *

"But the case most analogous to this. and in which the question came more directly before the court. is the case of the Providence Bank v. Billings, 4 Pet. 514 [7 L. Ed. 939], which was decided in 1830. In that case it appeared that the Legislature of Rhode Island had chartered the bank, in the usual form of such acts of incorporation. The charter contained no stipulation

on the part of the state that it would not impose a tax on the bank, nor any reservation of the right to do so. It was silent on this point. Afterwards, a law was passed, imposing a tax on all banks in the state; and the right to impose this tax was resisted by the Providence Bank, upon the ground that, if the state could impose a tax, it might tax so heavily as to render the franchise of no value, and destroy the institution; that the charter was a contract; and that a power which may in effect destroy the charter is inconsistent with it, and is impliedly renounced by granting it. But the court said that the taxing power was of vital importance, and essential to the existence of government, and that the relinquishment of such a power is never to be assumed. And in delivering the opinion of the court the late Chief Justice states the principle in the following clear and emphatic language. Speaking of the taxing power, he says: 'As the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear.' The case now before the court is, in principle, precisely the same. It is a charter from a state; the act of incorporation is silent in relation to the contested power. The argument in favor of the proprietors of the Charles River Bridge is the same, almost in words, with that used by the Providence Bank; that is, that the power claimed by the state, if it exists, may be 'so used as to destroy the value of the franchise they have granted to the corporation. The argument must receive the same answer; and the fact that the power has been already exercised, so as to destroy the value of the franchise, cannot in any degree affect the principle. The existence of the power does not, and cannot, depend upon the circumstance of its having been exercised or not.

"It may, perhaps, be said that, in the case of the Providence Bank, this court were speaking of the taxing power, which is of vital importance to the very existence of every government. But the object and end of all government is to promote the happiness and prosperity of the community by which it is established; and it can never be assumed that the government intended to diminish its power of accomplishing the end for which it was created. And in a country like ours, free, active, and enterprising, continually advancing in numbers and wealth, new channels of communication are daily found necessary, both for travel and trade, and are essential to the comfort, convenience, and prosperity of the people. A state ought never to be presumed to surrender this power, because, like the taxing power, the whole community have an interest in preserving it undiminished. And when a corporation alleges that a state has surrendered, for 70 years, its power of improvement and public accommodation, in a great and important line of travel, along which a vast number of its citizens must daily pass, the community have a right to insist, in the language of this court, above quoted, 'that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear.' The continued existence of a government would be of no great value, if, by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation, and the functions it was designed to perform, transferred to the hands of privileged corporations. The rule of construction announced by the court was not confined to the taxing power, nor is it so limited, in the opinion delivered. On the contrary, it was distinctly placed on the ground that the interests of the community were concerned in preserving, undiminished, the power then in question; and whenever any power of the state is said to be surrendered or diminished, whether it be the taxing power, or any other affecting the public interest, the same principle applies, and the rule of construction must be the same. No one will question that the interest of the great body of the people of the state would, in this instance, be affected by the surrender of this great competition for 70 years. While the rights of private property are sacredly guarded, we must not forget that the community also have rights, and that the happiness and well-being of every citizen depends on their faithful preservation."

Mr. McCutchen, in his brief, at page 27, refers to the rule of strict construction applicable to private legislative grants as "a rule which

grew out of the situation presented by adventurers, as they were called, seeking private grants from the crown, and themselves drawing the grants and employing ambiguous language, and then endeavoring to take advantage of the ambiguity." Whatever may have been the origin of the rule in England, it is obvious from the case last cited that the Supreme Court of the United States does not ascribe its adoption by our own tribunals to the reason above indicated, but places it upon the higher, broader ground that powers of government designed to subserve the general welfare can never be surrendered by implication, or, in the court's own language, repeating the extract from the last quotation (underscoring mine):

"The continued existence of a government would be of no great value, if, by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation, and the functions it was designed to perform, transferred to the hands of privileged corporations. The rule of construction announced by the court was not confined to the taxing power, nor is it so limited, in the opinion delivered. On the contrary, *it was distinctly placed on the ground that the interests of the community were concerned in preserving, undiminished, the power then in question;* and whenever any power of the state is said to be surrendered or diminished, whether it be the taxing power, or any other affecting the public interest, the same principle applies, and the rule of construction must be the same."

Thus it clearly appears that the reason for the rule which limits a franchise to the express words of the grant is just as strong in the case of a constitutional provision as in that of a legislative enactment; or, as defendants' brief filed September 9, 1909, at page 6, tersely puts the matter:

"The rule is applied, not because of the vehicle of the grant, but because of the nature of the grant."

See, also, Leavenworth, etc., R. R. Co. v. United States, 92 U. S. 733, 740, 23 L. Ed. 634, and Barden v. Northern Pac. R. R. Co., 154 U. S. 288, 325, 14 Sup. Ct. 1030, 38 L. Ed. 992.

The Supreme Court of California, on this subject, has said:

"The fact that the language to be construed here is a part of the Constitution of the state, and not a statutory provision, makes no difference. The rules of construction by which the meaning of the language is to be ascertained, and the rights and remedies which grow out of it, are the same, no matter where the language to be construed is found." Winchester v. Mabury, 122 Cal. 527, 55 Pac. 394.

The same court, in another case, says:

"As to the question whether the provision is self-executing, it is well to note, at the outset, that the presumption is not precisely as it would have been presented for consideration 50 years ago. When the federal Constitution and first state Constitutions were formed, the idea of a Constitution was that it merely outlined a government, provided for certain departments and some officers and defined their functions, secured some absolute and inalienable rights to the citizens, but left all matters of administration and policy to the departments which it created. The lawmaking power was vested wholly in the Legislature. Save as to the assurances of individual rights against the government, the direct operation of the Constitution was upon the government only. And such assurances were themselves in part but limitations upon governmental powers. Latterly, however, all this has been changed. Through distrust of the Legislatures and the natural love of power, the people have inserted in their Constitutions many provisions of a statutory character. These are in fact but laws made directly by the people instead

of by the Legislature, and they are to be construed and enforced, in all re-
spects, as though they were statutes. Winchester v. Mabury, 122 Cal. 522
[55 Pac. 393]. It has been held that section 16 of article 12 of the Constitu-
tion is of the nature of Code provisions in regard to procedure, and is to
be construed as other Code provisions are, except that it cannot be amended
or repealed by the Legislature. In effect, these constitutional provisions are
but statutes which the Legislature cannot repeal or amend. Under former
conditions it was natural that the court should presume that a constitutional
provision was addressed to some officer or department of the government, or
that it limited the power of the Legislature, or empowered, and perhaps di-
rected certain legislation, to carry into effect a constitutional policy. Now
the presumption is the reverse. Recently adopted state Constitutions contain
extensive Codes of laws, intended to operate directly upon the people as
statutes do. To-say that these are not self-executing may be to refuse to ex-
ecute the sovereign will of the people. The different policy requires a differ-
ent ruling." Winchester v. Howard, 136 Cal. 438, 69 Pac. 78, 89 Am. St. Rep.
153.

Nevada v. Hallock, 14 Nev. 202, 33 Am. Rep. 559, is without force
as a precedent here. The constitutional provisions there involved con-
ferred no franchise whatever, but merely declared that paupers should
be maintained by the respective counties of the state. This unques-
tionably fixed a public policy, and the court held that an act of the
Legislature creating a state asylum, and depriving the respective coun-
ties of the means of providing for their own poor, contravened such
policy, and was therefore void, saying:

"It is true the Constitution does not expressly inhibit the power which the
Legislature has assumed to exercise; but an express inhibition is not neces-
sary. The affirmation of a distinct policy upon any specific point in a state
Constitution implies the negation of any power in the Legislature to estab-
lish a different policy. 'Every positive direction contains an implication
against anything contrary to it which would frustrate or disappoint the pur-
pose of that provision. The frame of the government, the grant of legislative
power itself, the organization of the executive authority, the erection of the
principal courts of justice, create implied limitations upon the lawmaking
authority as strong as though a negative was expressed in each instance.'"

Spier v. Baker, 120 Cal. 370, 52 Pac. 659, 41 L. R. A. 196, is also
inapplicable. Section 1 of article 2 of the Constitution of California,
there in issue, does not purport to define the nature and extent of the
elective franchise, but is simply an enumeration of the persons en-
titled to exercise it, and the court properly said:

"The Legislature can no more extend the right of suffrage to persons not
included in the constitutional provision than it can deprive persons there
included of the right. The application of the maxim, 'Expressio unius est
exclusio alterius,' bears with full force upon this provision of the Constitu-
tion declaring who are competent to vote at elections authorized by the laws
of this state."

Nor does People v. Stephens, 62 Cal. 209, holding that the word
"cities" in article 11, § 19, includes towns, conflict with the rule of
construction which I have announced, for there the ruling of the court
in no way affects the nature or extent of the franchise, but only adds,
by implication, another class of municipalities to the one expressly
named in the section. And it may be further observed that to multiply
the persons by whom, or the places in which, a franchise such as com-
plainant's may be exercised, does not promote, but is restrictive of
monopoly.

Both reason and authority sanction the doctrine that, wherever the nature and extent of a franchise restrictive of legislative power is in issue, no matter through what agency of government the franchise was conveyed, whether a constitutional convention, a Legislature, or a municipality, the rule of strict construction against the grantee uniformly prevails, and, applying this doctrine, it must be held that complainant's franchise does not shut out municipal competition.

By no rule of construction, however, whether liberal in favor of the public, or such as applies to ordinary agreements between individuals, can a different conclusion be reached. Section 19 of article 11 certainly does not expressly grant an exclusive privilege, but shows on its face that its sole purpose was to prevent monopoly. If it were ever permissible to enlarge by implication grants of special privileges affecting the general interests, where can there be found in the case at bar any justification for such an enlargement?

Complainant invokes the debates and acts of the constitutional convention, and these, it will be readily conceded, are often useful aids to the interpretation of ambiguous clauses (6 Am. & Eng. Ency. of Law [2d Ed.] p. 922); but, if there were a doubt as to the meaning of the section here in question, the proceedings of said convention would resolve the doubt, not in favor of, but' against complainant's contention. Said proceedings in part are quoted by Judge Ross in People v. Stephens, supra, and reproduced by Mr. McCutchen, in his brief already mentioned, and a fuller account, although with slight inaccuracies, is given in the brief filed on behalf of the city and county of San Francisco, August 30, 1909. Mr. McCutchen, at page 4 of his brief, says:

"We all know, those of us who are familiar with the history of this state, and particularly with the history of that time—and I assume that all here are so familiar—that the matter of granting franchises to corporations to use the public streets to supply gas and water had, according to members of the constitutional convention, become a matter of public scandal. We all know that it was currently reported during the proceedings of the convention that in the city of Los Angeles, in the city of Oakland, in the city of San José, and in the City of San Francisco, petitions for the privilege of using the streets had been presented to the bodies having the power to grant such rights, and it was said that, as often as presented, they were denied. That was the situation when the convention was sitting."

Mr. Volney E. Howard, of Los Angeles, was the author of said section and offered it originally as an amendment to section 25 of article 11; but it afterwards became section 19 of said article. In support of his proposed amendment, Mr. Howard, among other things, said (underscoring mine):

"This is a different proposition altogether from the one struck out. My provision steers clear of confining this privilege to corporations or incorporated companies. It gives to any individual, as well as to any incorporated company, the right to the use of the streets for laying down pipes for the supply of gas and water, or either. I think that the objection that was taken to the section as formerly introduced was well taken: That it should not be limited to corporations; that any individual, for the public good, should have the right to use the streets for laying down pipes for supplying water or gas. * * * Now, in Los Angeles we have a gas company with a monopoly for 20 years, and several parties have endeavored to get the privilege for laying down pipes in the streets for the purpose of supplying

the city and competing with this company; but the company has always had sufficient influence in the municipal government to prevent this being done, and this company has a prospect of exclusive right for 20 years to come. Now, I submit to the convention that this is a great abuse of public authority, and that it ought to be corrected. We have also a water company that claims the monopoly, and the private individual who did succeed in laying down pipes, and is to some extent supplying the city with water in opposition to the monopoly, is threatened constantly with suits and injunctions, and if this thing goes on we will have a monopoly, not only of water and gas, but of all domestic necessaries, and then we will have some ,company that will be peddling it by the tin cup full. It is time this abuse was corrected, and therefore I offer this amendment. * * *

"I beg to say that I have no personal interest in this matter. I am not an attorney for the Spring Valley Water Company, nor any other waterworks, nor any gas company. I move solely in the public interest, and the public interest requires not only that the section itself should be adopted, but that the amendment should be adopted. I did not suppose that anybody in the interest of any monopoly would support my proposition. I do not expect that. * * *

"Mr. Smith, of Fourth District: Does not this power exist if the Constitution is silent upon the subject?

"Mr. Howard: It is obligatory. Without this amendment the evil is not reached. *The city government, if it chooses, could give the power; but if it chooses to withhold it it can withhold it, and they always have men enough in the interest of the monopoly to prevent any party from entering into any competition with it. This is to avoid that.* It is to make it obligatory upon a city government, when it is properly secured under proper regulation, which they themselves prescribe, to give any party the right to introduce water and gas, and to compete with any existing monopoly."

2 Debates Cons. Con. 1878–79, pp. 1076, 1077.

The sole object and entire scope of the section is fully and clearly expressed in the sentences above underscored, and I am at a loss to see how there can be given to it a different or a broader meaning than thus stated and defined.

Speaking to the same provisions, although embodied in another section, Mr. Reynolds said (underscoring mine):

"Mr. Chairman: I hope the section will not be stricken out. The reason why that section is inserted here may need a word of explanation. It seems to me it ought not to need a word of explanation to any resident of the city of San Francisco. There have been frequent attempts to introduce water, even artesian well water, in San Francisco, and persons who have sunk artesian wells in, different parts of the city, and finding that they had an abundant supply, have asked the privilege of supplying their neighbors in the same block, or perhaps adjoining blocks, and have sought the privilege of merely laying down supply pipes, to supply their neighbors with water that they have brought out of the depths of the earth, could not get the privilege from a board of supervisors to do that. They have stood ready all the time to give any amount of bonds required or named. They could not get the privilege. We understand the reason very well—the power of Spring Valley.

"Again, there have been, during the session of this convention, parties who have sought the privilege of erecting gasworks and laying down gas pipes, and supplying that city with gas at a reasonable figure, offering to comply with any bond that might be named, offering to give any necessary bond—not only that, but any bond that the supervisors dare name. Could they get the privilege? No, sir! The San Francisco Gaslight Company stood in the way. Now, *this section seeks to obviate that and give all parties the bare right to lay down water pipes—the bare naked right to do so.* * * * I do not see why such a section as that should not be adopted. *It is simply to break the power of overshadowing monopolists.*

"Mr. Chairman: I dislike to declaim here against water monopolies and gas monopolies. It is a hackneyed phrase, I know, and I dislike to use it;

but, sir, these institutions are all-powerful, and it is necessary to use it. Practical experience proves it to be necessary. It is, beyond dispute, that we need some such declaration in the law we pass to give these parties the right to use the streets to supply the people with these necessaries of life. *All we wish to do here in this section is to declare the right to use our streets for the purpose of laying down water pipes and gas pipes, as well as of travel, subject to the proper conditions. That seems to be all that is necessary to say on this subject.* Where a water company and a gas company—and they work together wherever it is necessary—have enjoyed a right to furnish all the water and all the gas to a city of 300,000 inhabitants for many years, they have acquired wealth and have acquired influence in so many ways that it is almost impossible for a private citizen, or for a new company, to come in there with any sort of opposition, without incurring difficulties that are absolutely insurmountable. That has been found to be the case. Within the past two or three months parties have been endeavoring to get this privilege, but they could not do it upon any conditions. They could not do it when they offered the city the privilege of naming its terms." Id. 1072.

Immediately following, and speaking to the same subject, Mr. Estee said:

"Mr. Chairman: What my friend from San Francisco says in reference to the gas and water companies is undoubtedly true, but I find that section 9 prescribes a plan for a city government with full power." Id. 1072.

Said proceedings were had January 18, 1879. Earlier the same day the first discussion in the convention concerning water and gas monopolies took place. It arose on the report of the committee on city, county, and township organization; the particular clause under consideration being what was then numbered section 20, but afterwards became section 18 of article 11. The section as reported fixed a maximum limit upon the bonded indebtedness it authorized of 5 per cent. of the assessed value of the taxable property. Various amendments were proposed, among them one by Mr. Caples, substituting 2 per cent. as the maximum, which was adopted with but little debate at the time, and another by Mr. Estee adding to the exception already made that of acquiring or constructing waterworks. Id. 1068, 1069.

Mr. Hager, in opposition to Mr. Estee's proposed amendment, said:

"We do not want to purchase Spring Valley Waterworks, and do not want to be compelled to purchase them. * * * I believe they profess to own all the supplies in the state. I do not suppose there will be any works constructed in the city of San Francisco unless the Spring Valley Water Company disposes of theirs. Every effort that has been hitherto made has failed, because the Spring Valley Water Company was there to interpose. You must purchase their works, at twice what they are worth, or else you will have no water at all. There is another clause reported here by this committee that any person shall have the privilege of supplying water to cities. As it is now, no one can get the privilege in San Francisco, because the power of the Spring Valley Water Company is so great." Id. 1070.

Mr. Reynolds at the same time adverted to the 2 per cent. limit as follows:

"It needs but little reflection to show that 2 per cent. indebtedness is wholly inadequate for the purpose of enabling the city of San Francisco ever to acquire its waterworks in any manner whatever—by condemnation, purchase, or otherwise. During the last two years many estimates have been made and much money expended in obtaining them, and they all show that it would cost many times $5,000,000 to procure water in the cheapest manner that it can be procured. So that to restrict the city to 2 per cent. is to cut it off from the possibility of owning its own water supply. How absurd is the rea-

soning that would permit a county, or a city and county, to erect a courthouse, or a jail, or a schoolhouse, and tie its hands so that it cannot provide itself with water to drink. It does not seem to me to be any argument. The city ought to be free to purchase its waterworks, to condemn, or build, without any restriction. If there is any exception to be made, certainly the supply of water ought to come first." Id. 1070.

Mr. Grace at the same time said:

"I am not certain that I clearly understand what is before the house; but I am certain that I do know that the people of San Francisco whom I represent do not want to purchase the Spring Valley Waterworks. They do not want anything in this Constitution that will aid and abet in any way that company. * * *" Id. 1070.

Mr. Gorman on the same day said:

"I hope the amendment offered by the gentleman from San Francisco, Mr. Estee, will prevail. I believe that the city of San Francisco is the most peculiar city in the world in regard to water; the sands from the ocean blow through the streets, and almost cover the houses in places. We need more water in that city for domestic uses, and for street purposes, than any city in the world. We want it for our public parks, and, if we were to limit the supply to what cities generally need, it would not be a quarter of what the city should have. In the summer time, when there is long periods without rain, the sewers get so foul that, if it was in a warm climate the mortality would be terrible, and even as it is the sewers have to be flushed very often. If we have to pay for the water, we can scarcely sprinkle the streets of the city in sufficient quantities. If the city owned its own waterworks, it could be used for many purposes; we could have plenty of water for the parks, for the streets, for the sewers, and for manufacturing and domestic purposes. They say you can regulate the price of water. But either the city would have to pay an immense amount for the water, or you would have to reduce the price so low as to break the company—one thing or the other. We have seen in San Francisco, where there were large fires, that the mains conducting the water were altogether insufficient in size. The city should own its own waterworks. They should put in pipes sufficiently large that in cases of fire the people could have all the water necessary. The water in the past years has been so bad from this Spring Valley Company that it could scarcely be used. It was filled full of living matter, to be seen by the eye coming out of the pipes. The Spring Valley Water Company have control of all heads of streams and lakes within 30 or 40 miles of San Francisco, of all the water capable of being brought into the city; and certainly we need the power to construct or acquire waterworks more than any city in the world." Id. 1070, 1071.

The amendment of Mr. Estee was then adopted. Id. 1071. Subsequently, on February 27th, while said section was again under consideration, the following proceedings were had:

"Mr. Laine: Mr. President, I hope that all these amendments will be voted down, and that some member will move to strike out all the latter part of the section; it simply hampers the people unnecessarily.

"Mr. Freeman: Mr. President, I hope, with the last gentleman, that all amendments will be voted down until we come to the one indicated by him. A two-thirds vote ought to be sufficient to guard against abuses. The rest of the section is merely a limitation upon the right of self-preservation. * * *

"Mr. Laine: Mr. President, I now offer an amendment." Id. 1382.

This amendment struck out certain parts of the section, and was adopted. Id. 1383. One of its effects was to leave the entire section, as it now stands, *without any limitation upon the amount of bonded indebtedness.*

This last action of the convention, and the debates, which I have quoted, leading up to it, although nominally affecting only section 18, have a direct interpretative bearing upon the latter section, section 19 of article 11, and strongly confirm the remarks of Mr. Howard as to its purpose and meaning.

The Supreme Court of the state, in a case already cited, comments on said remarks as follows (underscoring mine) :

"We have quoted at length the remarks accompanying the introduction of the provision, for the purpose of showing that the members of the constitutional convention had distinctly put before them the evils intended to be remedied, and the purpose of the enactment; and, thus informed, they adopted it. Yet we are asked to hold, in effect, that, after all, the *whole* matter rests where it did before—with the Legislature. This we cannot do. Nor, under our construction of the provisions in question, do we discover any indication of a return 'to the doctrine of the Dartmouth College Case,' nor any *fostering of monopolies, but, on the contrary, the most manifest intent to prevent them as respects the important subjects treated of—gas and water.* By the adoption of those provisions the people asserted their unwillingness to leave the *entire* subject in the hands of the Legislature, and, in the *particulars already indicated,* declared the rule that should govern, in the organic law itself, and gave to the Legislature the 'regulation and control' in **all** other respects." People v. Stephens, 62 Cal. 209, 236.

During the entire debate on the Howard amendment and proposed limitation of bonded indebtedness, there was not the slightest intimation that acceptance of the franchise offered by said amendment would exclude public works, and from the views and dispositions of the members of the convention, shown in the proceedings I have quoted, it is unbelievable that they ever intended to shield the waterworks and gasworks of San Francisco and Los Angeles or any city from municipal or any other sort of competition, or that they intended to prevent or hinder, under any circumstances, the building of waterworks by a city; but, on the contrary, the conclusion is irresistible that their one purpose in this matter was to allow no legal obstacle to stand in the way of such public ownership.

Nor can arguments ab inconvenienti justify any enlargement by implication of complainant's franchise.

On this subject the following extract may be aptly quoted (underscoring mine) :

"It is scarcely necessary to observe that, *in construing the language of a Constitution, we have nothing to do with arguments ab inconvenienti, for the purpose of enlarging or contracting its import. Id. 408, 409, §§ 425, 426. 'The only sound principle is to declare it a lex scripta est, to follow and to obey.' "* People v. Morrell, 21 Wend. (N. Y.) 563, 583.

See, also, Greencastle Township v. Black, 5 Ind. 566, 570.

State decisions to the same effect might be indefinitely multiplied (6 Am. & Eng. Ency. of Law [2d Ed.] 923) ; but it is needless to do so here, since the Supreme Court of the United States, in the Knoxville Case, supra, beginning at page 35 of 200 U. S., at page 228 of 26 Sup. Ct. (50 L. Ed. 353), settles the doctrine thus:

"The agreement, as executed, is entirely consistent with the idea that while the city, at the time of making the agreement of 1882, had no purpose or plan to establish and operate its own waterworks in competition with those of the water company, it refrained from binding itself not to do so,

although willing to stipulate, as it did stipulate, that the grant to the water company should be exclusive as against all other persons or corporations. We are therefore constrained by the words of the agreement to hold that the city did not assume, by any contract protected by the Constitution of the United States, to restrict its right to have a system of waterworks, independent altogether of the system established and maintained by the water company. If this interpretation of the contract will bring hardship and loss to the water company, and to those having an interest in its property and bonds, the result (omitting now any consideration of the question of power) is due to the absence from the agreement between the parties of any stipulation binding the city not to do what, unless restrained, it now proposes to do.

"While there is no case precisely like the present one in all its facts, the adjudged cases lead to no other conclusion than the one just indicated. We may well repeat here what was said in a somewhat similar case, where a municipal corporation established gasworks of its own in competition with a private gas company which under previous authority had placed its pipes, mains, etc., in public streets to supply, and was supplying gas for a city and its inhabitants: 'It may be that the stockholders of the plaintiff supposed, at the time it became incorporated, and when they made their original investment, that the city would never do what evidently is contemplated by the ordinance of 1889. And it may be that the erection and maintenance of gasworks by the city at public expense, and in competition with the plaintiff, will ultimately impair, if not destroy, the value of the plaintiff's works for the purposes for which they were established. But such considerations cannot control the determination of the legal rights of parties. As said by this court in Curtis v. Whitney, 13 Wall. 68, 70 [20 L. Ed. 513]: "Nor does every statute which affects the value of a contract impair its obligation. It is one of the contingencies to which parties look now in making a large class of contracts, that they may be affected in many ways by state and national legislation." If parties wish to guard against contingencies of that kind, they must do so by such clear and explicit language as will take their contracts out of the established rule that public grants, susceptible of two constructions, must receive the one most favorable to the public.' Hamilton Gaslight Co. v. Hamilton City, 146 U. S. 258, 268 [13 Sup. Ct. 90, 36 L. Ed. 963]; Skaneateles Water Co. v. Skaneateles, 184 U. S. 354, 363 [22 Sup. Ct. 400, 46 L. Ed. 585].

"So in Joplin v. Light Co., 191 U. S. 150, 156 [24 Sup. Ct. 43, 44 (48 L. Ed. 127)], which involved the question whether a city could establish its own electric plant in competition with that of a private corporation, the court said: 'The limitation contended for is upon a governmental agency, and restraints upon that must not be readily implied. The appellee concedes, as we have seen, that it has no exclusive right, and yet contends for a limitation upon the city which might give it (the appellee) a practical monopoly. Others may not compete with it, and, if the city cannot, the city is left with a useless potentiality while the appellee exercises and enjoys a practically exclusive right. There are presumptions, we repeat, against the granting of exclusive rights and against limitations upon the powers of government.'

"Again, in the recent case of Helena Waterworks Company v. Helena, 195 U. S. 383, 392 [25 Sup. Ct. 40, 43 (49 L. Ed. 245)], where a city established its own system of waterworks in competition with that of a private company, the court, observing that the city had not specifically bound itself not to construct its own plant, said: 'Had it been intended to exclude the city from exercising the privilege of establishing its own plant, such purpose could have been expressed by apt words, as was the case in Walla Walla City v. Walla Walla Water Company, 172 U. S. 1 [19 Sup. Ct. 77, 43 L. Ed. 341]. It is doubtless true that the erection of such a plant by the city will render the property of the water company less valuable and, perhaps, unprofitable; but, if it was intended to prevent such competition, a right to do so should not have have been left to argument or implication, but made certain by the terms of the contract.' To the same effect, as to the principle involved, are Turnpike Co. v. State. 3 Wall. 210, 213 [18 L. Ed. 180]; Stein v. Bienville Water Supply Co., 141 U. S. 67, 81 [11 Sup. Ct. 892, 35 L. Ed. 622]; Long Island Water Supply Co. v. Brooklyn, 166 U. S. 685 [17 Sup. Ct. 718, 41 L. Ed. 1165]."

I am of opinion that complainant's franchise is not exclusive against the city of Madera, and that the construction and operation of water-works by said city will violate no provision of either the state or federal Constitution.

The demurrer to the bill will, accordingly, be sustained.