[L. A. No. 2794. In Bank.—May 31, 1911.]

PERCY H. CLARK, Appellant, v. CITY OF LOS ANGE-
LES et al., Respondents.

MUNICIPAL CORPORATION — LOS ANGELES — ACQUISITION OF ELECTRIC
WORKS—BONDED INDEBTEDNESS.—Under subdivision 7 of section 2
of article I of the charter of the city of Los Angeles (Stats. 1889,
p. 457), as amended March 12, 1909, (Stats. 1909, p. 1291), the
city has the power to establish, operate, and maintain electric works

wherewith to supply the inhabitants of the city with electricity for private use, and to incur a bonded indebtedness therefor.

ID.—ELECTRICITY FOR MOTIVE POWER—MUNICIPAL FUNCTION.—The supplying of electricity for motive power is a public service in which a municipal corporation may engage.

ID.—CONSTITUTIONAL INHIBITION ON ACQUISITION OF PUBLIC UTILITIES.— There is no provision of the state constitution which either expressly or by implication forbids the acquisition, ownership, or operation of any such public utilities by a municipality, or prohibits the granting to a municipality of the power to acquire, own, and operate them.

ID.—RESOLUTION DECLARING PURPOSE OF BONDED INDEBTEDNESS—ACQUIRING AND CONSTRUCTING DESCRIBED IMPROVEMENT—ENGAGING IN BUSINESS BEYOND MUNICIPALITY.—A resolution of the city council declaring the purpose of a bonded indebtedness to be that "of acquiring and constructing a certain revenue producing municipal improvement, to wit, works for generating and distributing electricity for the purpose of supplying said city and its inhabitants with light, heat, and power, including the acquisition of lands, water-rights, rights of way, machinery, apparatus and other property, and the construction of electric generating works, sub-stations, transmission and distributing lines, conduits and other works necessary therefor," does not disclose any intention on the part of the municipality of selling surplus electric power to consumers outside of its boundaries.

ID.—SECRET INTENT TO ENGAGE IN BUSINESS BEYOND CITY LIMITS— VALIDITY OF BONDS NOT AFFECTED.—A secret or avowed intention of the city to engage in the business of selling electric power to consumers beyond its municipal boundaries, even if without authority, would not affect the validity of bonds authorized and issued solely for the legitimate purpose of supplying electricity to the city and its inhabitants.

ID.—SUPPLYING ELECTRIC POWER FOR PRIVATE USE—DEDICATION TO PUBLIC USE.—A dedication of electric works and the product thereof to the purpose of supplying electric power to the inhabitants of the city for their private use is a dedication to a public use.

ID.—FRANCHISE—CONSTRUCTION IN FAVOR OF PUBLIC.—Grants of franchises and special privileges by the state to private persons or corporations are to be construed most strongly in favor of the public, and where the privilege claimed is doubtful nothing is to be taken by mere implication as against public rights.

ID.—NON-EXCLUSIVE FRANCHISE—MUNICIPALITY MAY ENGAGE IN SIMILAR BUSINESS.—Where a grant of such franchise by the state or some municipality thereof is not, by its terms, made an exclusive franchise, and the city in which it is to be exercised is not, by the law or ordinance granting it, forbidden or prevented from competing, the city may establish its own works for the same purpose and engage in the same public service within the city, although it may thereby injure or practically destroy the business of the holder of such franchise.

ID.—CONSTITUTIONAL GRANT OF USE OF STREETS—GRANT NOT EXCLUSIVE AS AGAINST MUNICIPALITY.—Section 19 of article XI of the state constitution, providing that in any city where there are no public works owned and controlled by the municipality for supplying the same with water or artificial light, any individual or corporation . . . shall have the privilege of using the public streets and of laying down pipes and conduits therein, so far as may be necessary for introducing into and supplying such city and its inhabitants either with gaslight or other illuminating light, or with fresh water for domestic and all other purposes, upon the condition that the municipal government shall have the right to regulate the charges thereof, cannot be construed to grant an exclusive franchise in the streets, or to prevent a city from establishing and operating such public waterworks or lightworks, notwithstanding the fact that private persons or corporations are using the streets in operating works of the same kind.

ID.—CONSTRUCTION OF CONSTITUTION — MANDATORY AND PROHIBITORY PROVISIONS.—The statement in section 22 of article I of the state constitution, that its provisions are mandatory and prohibitory, does not require a different interpretation of section 19 of article XI. It refers to the effect, not to the meaning, of the constitutional provisions, and declares that they are imperative and paramount, according to their true meaning, ascertained by the rules of construction otherwise applicable thereto.

ID.—CITIES HAVING NO MUNICIPAL WORKS—ACCEPTANCE OF CONSTITUTIONAL OFFER TO USE STREETS.—The fact that the constitutional right to use the streets is offered only in cities having no municipal works, raises no implication or inference that the city shall not establish municipal works after the constitutional offer to private parties has been accepted and used.

ID.—CONSTITUTION DOES NOT GRANT RIGHT TO ENGAGE IN BUSINESS— CITIES ACQUIRE POWER TO ADMINISTER PUBLIC UTILITIES FROM STATE.—Section 19 of article XI of the constitution does not purport to grant the right to engage in the business of furnishing water, gas, or electricity for general use. It presupposes such power or right, and merely gives the company or person having it the privilege of using the public streets as a way for its conduits. Cities have no inherent power to engage in administering such public utilities. They obtain such power by grant from the state.

ID.—CITIES NOT PROHIBITED BY CONSTITUTION FROM ADMINISTERING PUBLIC UTILITIES.—There is nothing in the language of section 19, or in the object which it was intended to accomplish—namely, to prevent the giving of the exclusive use of the streets to private persons or companies—which indicates that it was intended by that section to qualify or limit the power of the legislature to confer upon cities the power to engage in such business, or any business properly within the scope of municipal purposes.

ID.—QUESTION SUBMITTED TO VOTERS—FORM OF BALLOT—SINGLE PUR-
POSE OF QUESTION—CERTAINTY AND DETAIL OF QUESTION.—The ques-
tion, as printed on the ballot and used at the bond election, as
follows: "Shall the city of Los Angeles incur a bonded debt of
$3,500,000 for the purpose of acquiring and constructing a certain
revenue producing municipal improvement, to wit, works for gen-
erating and distributing electricity for the purpose of supplying
said city and its inhabitants with light, heat and power, including
the acquisition of lands, water-rights, rights of way, machinery,
apparatus and other property, and the construction of electric gen-
erating works, sub-stations, transmission and distributing lines,
conduits and other works necessary therefor," specifies but a single
object of purpose, within the meaning of the requirements of the
constitution (sec. 18, art. XI), and of the Bond Act (Stats. 1907,
p. 609), and does so with sufficient detail and certainty.

ID.—LOCATION OF PROPOSED WORKS — DESIGNATION AS WITHIN CITY
LIMITS.—There is no provision of the Bond Act, or of the consti-
tution, which requires that the question shall state the precise loca-
tion of the works to be provided out of the fund voted, or that they
should be within the city limits.

ID.—"ACQUIRING AND CONSTRUCTING" IMPROVEMENT.— SINGULARITY OF
PURPOSE.—The expression, "acquiring and constructing a certain
revenue producing municipal improvement," particularly described, is
not necessarily a statement of a dual purpose, and does not indicate
the purpose of acquiring two systems, one by purchase and the other
by construction. In connection with the context, it means the ac-
quisition of but one system, including the purchase of such property
and the erection of such structures as may be necessary to accom-
plish that purpose.

ID.—TIME OF PAYMENT OF BONDS—DATE TO BE FIXED BY CITY COUNCIL.
—The proposition submitted to the voters need not state when the
bonds shall become payable. Section 5 of the Bond Act provides
that the city council shall determine that question, and contemplates
that it may be done either before or after the vote of the people is
taken on the issuance of the bonds, and without action thereon by
the people.

ID.—ESTIMATE OF COST OF IMPROVEMENT—STATEMENT OF IN RESOLUTION
AND ORDINANCE.—A declaration in the original resolution of inten-
tion to establish the improvement and in the ordinance calling the
election, that the estimated cost of the proposed improvement was
three million five hundred thousand dollars, is a sufficient compliance
with section 2 of the Bond Act, requiring that such ordinance shall
recite "the estimated cost of the proposed public improvements." It
will be presumed from such recital that the city council had pre-
viously made the estimate stated.

ID.—PRINTING TITLE OF ORDINANCE IN BLACK-FACE TYPE.—Where the
ordinance calling the election, as published, was preceded by its
CLX Cal.—3

title, which clearly described its purport, the fact that such title was not printed in black-face type, as directed by section 4459 of the Political Code, is too unimportant to warrant a holding that the proceedings were thereby vitiated.

ID.—IRREGULARITIES IN MUNICIPAL BONDS VALIDATED BY ACT OF 1911.—The act of March 21, 1911, validated all bond issues irregularly authorized by any municipality if they had at the election called for that purpose received a two-thirds vote of the electors voting thereon.

ID.—AMOUNT OF MUNICIPAL INDEBTEDNESS — MERELY VOTING BONDS DOES NOT CREATE OR INCREASE DEBT.—The vote of the electors upon a proposition to issue bonds for municipal improvements does not *ipso facto* create a debt against the city to the amount authorized. The indebtedness of the city is not thereby increased. The increase occurs when the bonds are issued and become valid obligations in the hands of the holders—that is, when they are sold and delivered to the purchaser.

ID.—EXTENSION OF LIMIT OF INDEBTEDNESS AFTER BONDS ARE VOTED AND BEFORE ISSUANCE—VALIDITY OF ISSUE.—If, at the time the bonds of a municipality are issued and become lawful debts, they do not raise the indebtedness above the legal limit, as then established, they will not be deemed void because of the fact that at the time the vote authorizing them was taken the amount voted would have exceeded the then existing limit.

ID.—AMENDMENT OF CHARTER—JUDICIAL NOTICE.—The amendment of March 6, 1911, to the charter of the city of Los Angeles, which was approved by the legislature on March 20, 1911, has the effect of a law and is a matter of judicial knowledge.

APPEAL from a judgment of the Superior Court of Los Angeles County. Charles Monroe, Judge.

The facts are stated in the opinion of the court.

Scarborough & Bowen, for Appellant.

J. W. McKinley, and Edward G. Kuster, *Amici Curiæ,* for petition for rehearing.

John W. Shenk, City Attorney, and Leslie R. Hewitt, and W. B. Mathews, for Respondents.

SHAW, J.—This is an action by the plaintiff as a resident and taxpayer of the city of Los Angeles, against the city, the members of the city council, the mayor, clerk, and treasurer, to enjoin them from issuing and selling certain city bonds to the amount of three million five hundred thousand dollars

authorized by a vote of the electors of the city at an election held for that purpose on April 19, 1910, and to declare said bonds void. A general demurrer to the complaint was sustained and thereupon judgment was given for the defendants. The plaintiff appeals.

The resolution determining that such bond issue was necessary, stated that the creation of the bonded debt was necessary for the "purpose of acquiring and constructing a certain revenue producing municipal improvement, to wit: works for generating and distributing electricity for the purpose of supplying said city and its inhabitants with light, heat and power, including the acquisition of lands, water-rights, rights of way, machinery, apparatus and other property, and the construction of electric generating works, sub-stations, transmission and distributing lines, conduits and other works necessary therefor." The ordinance calling the election stated, in the same words, the purpose for which the debt to be voted on was to be incurred. The question, as stated on the ballot, described the purpose in the same language. The vote was in favor of the proposed bond issue. The defendants intend to and will sell the bonds so authorized, unless restrained by the court.

1. The main purpose stated in the proceedings, to which the money is to be applied, is to establish, operate, and maintain electric works wherewith to supply the inhabitants of the city with electricity for private use. It is contended that the city has no power to engage in such an enterprise, or to construct or operate works for that purpose.

The contention is untenable. Subdivision 7 of section 2 of article I of the Los Angeles charter (Stats. 1889, p. 457), as amended March 12, 1909 (Stats. 1909, p. 1291), provides that "The said corporation shall have power: (7) To provide for supplying the city and its inhabitants with water, gas and electricity, or either or any thereof, or with other means of heat, illumination or power; and to acquire or construct and to lease or operate, and to regulate the construction or operation of conduits or of railroads, or other means of transportation, and of plants and equipments for the production or transmission of gas, electricity, heat, refrigeration or power, in any of their forms, by pipes, wires or other means, and to incur a bonded indebtedness for any of such purposes."

It is difficult to perceive how the power to supply electricity to the inhabitants of the city for their private use could be conferred in clearer or more appropriate terms. There seems to be no foundation for the argument that the power of the city to procure or produce water, gas, or electricity, and supply it to the inhabitants is limited by this provision to the procuring of these substances for public uses alone, such as the watering of public streets, the flushing of public sewers, the lighting of public streets and buildings or the running of elevators in public buildings and heating the rooms therein. The statement of the proposition, in connection with the provision above quoted, is a sufficient refutation of it. The case of *Hyatt* v. *Williams*, 148 Cal. 585, [84 Pac. 41], construes the provisions of the former charter of Stockton giving that city power to provide for lighting public streets, public places and public buildings. With respect to private uses by the inhabitants, or supplying light to inhabitants at all, except such as they got by going into public places and sharing the public lights, that charter was wholly silent. The decision not only fails to support appellant's position; it inferentially suggests the contrary as the proper and obvious construction of the Los Angeles charter. The decision of the district court of appeal for the third district in *Cary* v. *Blodgett*, 10 Cal. App. 463, [102 Pac. 668], is substantially on all fours with the case at bar. The case was presented to the supreme court by a petition for rehearing upon this point, which was refused. It holds that the statute giving power to cities of the sixth class "to acquire, own, construct, maintain and operate street-railways, telephone and telegraph lines, gas and other works for light and heat" (Municipal Corporation Act, sec. 862, [Stats. 1906, p. 898]), authorized such cities to erect and operate an electric-light plant and thereby supply the inhabitants of the city with electricity for private use. It is practically a decision of this court on that point. The charter of the city of Los Angeles is much more explicit on this subject than section 862 aforesaid, and it clearly gives the city the power in question.

2. It is also suggested that the proceedings must be declared void because of the provisions of subdivisions 7a and 26, of section 2 of article I of the charter, as amended in 1909. These subdivisions authorize the city to sell surplus water or

surplus electric power, belonging to the city, to other cities, or to consumers outside of the city of Los Angeles. It is argued that this, in effect, gives the city unlimited power to engage in the business of generating and supplying electricity throughout the state, as a commercial enterprise, in the same manner and to the same extent as any public service corporation or private person might do, and that this is not a municipal purpose and the exercise of it would be beyond the power of the city as a corporation for municipal purposes, within the meaning of the constitution (art. XI, sec. 6, citing *Low* v. *Marysville,* 5 Cal. 214.) There is nothing in the ordinance calling the election, or in the resolution of intention preceding it, which suggests that the city intends to engage in any such enterprise, or even that it intends to sell any surplus of electricity over and above that needed by the city and its inhabitants. If it should attempt to engage in the business solely as a commercial enterprise for profit its power in that behalf can be tested when the attempt is made. These proceedings will not estop any citizen or taxpayer from making the objection at that time. Furthermore, the secret or avowed intention to do either of these things, even if without authority, would have no effect on the validity of bonds authorized and issued solely for the legitimate purpose of supplying electricity to the city and its inhabitants. The fact that such business was suggested in a report of the board of public works made to the council before the proceedings to issue the bonds were begun, does not make it a part of the proceedings nor affect the validity thereof.

3. There is no force or merit in the proposition that the proposed dedication of the contemplated works and the product thereof to the purpose of supplying electric power to the inhabitants of the city for their private use is not a dedication to public use. No substantial distinction can be drawn in that respect between the general distribution of electricity for power and its distribution for light or heat, or between the general distribution of electricity for power in private business, and the general distribution of gas or water for private use. We deem it unnecessary to discuss the question .

4. It is alleged in the complaint that the city of Los Angeles has not heretofore supplied to its inhabitants electricity or any other substance for light, heat, or power; that there are and

for many years have been certain public service corporations engaged in the business of supplying gas and electricity to the city and to its inhabitants, in general, for light, heat, and power for private and public uses and purposes; that these corporations have invested large sums of money in that business and now have much valuable property devoted thereto and necessary therefor; and that they have for that purpose availed themselves of the general grant from the state contained in section 19 of article XI of the constitution, of the privilege of using the public streets of said city, and have, in pursuance thereof, laid and maintained in said streets mains, pipes, conduits, poles, and wires for the transmission and distribution of gas and electricity to the city and its inhabitants, and now maintain and operate the same. It is earnestly insisted that the effect of the constitutional provision is to vest in these corporations a franchise which, so far as the city is concerned, is exclusive, or, at least, that it amounts to an undertaking or promise by the state, binding upon each city, respectively, that whenever any such corporation shall have accepted the offered franchise to use the streets and shall have laid therein its pipes and conduits, or erected its wires thereon, such city shall not thereafter engage in the same business therein in competition with such corporation, or use the streets for that purpose. The question is a new one in this court.

Section 19, aforesaid, is as follows:—

"In any city where there are no public works owned and controlled by the municipality for supplying the same with water or artificial light, any individual, or any company duly incorporated for such purpose, under and by authority of the laws of this state, shall, under the direction of the superintendent of streets, or other officer in control thereof, and under such general regulations as the municipality may prescribe for damages and indemnity for damages, have the privilege of using the public streets and thoroughfares thereof, and of laying down pipes and conduits therein, and connections therewith, so far as may be necessary for introducing into and supplying such city and its inhabitants either with gaslight, or other illuminating light, or with fresh water for domestic and all other purposes, upon the condition that the municipal government shall have the right to regulate the charges thereof."

It is a general principle of construction, too well established to require discussion, that grants of franchises and special privileges by the state to private persons or corporations are to be construed most strongly in favor of the public, and that, where the privilege claimed is doubtful, nothing is to be taken by mere implication as against public rights. (*Charles River B. Co.* v. *Warren B. Co.,* 11 Pet. [U. S.] 543, 547, [9 L. Ed. 773]; *Helena W. Co.* v. *Helena,* 195 U. S. 392, [25 Sup. Ct. 40, 49 L. Ed. 245]; *Knoxville W. Co.* v. *Knoxville,* 200 U. S. 33, [26 Sup. Ct. 224, 50 L. Ed. 353]; *Mayrhofer* v. *Board,* 89 Cal. 112, [23 Am. St. Rep. 451, 26 Pac. 646]; *Skelly* v. *School Dist.,* 103 Cal. 655, [37 Pac. 643]; *Witter* v. *School Dist.,* 121 Cal. 350, [66 Am. St. Rep. 33, 53 Pac. 905].) It is also a settled rule founded upon the foregoing principle, and it is conceded by appellant, that where a grant of such franchise by the state or some municipality thereof is not, by its terms, made an exclusive franchise, and the city in which it is to be exercised is not, by the law or ordinance granting it, forbidden or prevented from competing, then a city may establish its own works for the same purpose and engage in the same public service within the city, although it may thereby injure, or practically destroy, the business of the holder of such franchise. (*Knoxville W. Co.* v. *Knoxville,* 200 U. S. 33, [26 Sup. Ct. 224, 50 L. Ed. 353]; *Helena W. Co.* v. *Helena,* 195 U. S. 392, [25 Sup. Ct. 40, 49 L. Ed. 245]; *Joplin* v. *Light Co.,* 191 U. S. 156, [24 Sup. Ct. 43, 48 L. Ed. 127]; *Hamilton G. Co.* v. *Hamilton,* 146 U. S. 268, [13 Sup. Ct. 90, 36 L. Ed. 963]; *Skaneateles W. Co.* v. *Skaneateles,* 184 U. S. 363, [22 Sup. Ct. 400, 46 L. Ed. 585].)

The express grant made by section 19 is of the privilege, franchise, or easement to place in the public streets of a city the conduits necessary or convenient for the business of supplying light or power to the city and its inhabitants. It may be accepted by any person, or by any company duly incorporated to engage in that business. The section does not declare that such franchise or easement, when accepted, shall be exclusive. It implies the contrary, for it does not confine the grant to the first person or corporation to accept it and use the streets, but extends it to "any individual or any company." (See *Stockton etc. Co.* v. *San Joaquin Co.,* 148 Cal. 318, [5 L. R. A. (N. S.) 174, 83 Pac. 54].) The debates over

its passage in the constitutional convention show that it was not intended to give a monopoly to the first company, or to encourage monopolies at all, but to prevent them, so far as the right to use the streets was concerned, by conferring the right upon any competitor against an established company. (*People* v. *Stephens*, 62 Cal. 235.) It is true the right is not given in cities which are operating municipal works for the same purpose. But there is nothing in the terms of the section which would prevent a city from granting to an opposition company a right to establish such works, nor anything in the nature of a declaration, promise, or assurance that cities which have no such public works shall not establish such works and use the streets therefor after a private company has availed itself of the privilege granted. Under the rule stated, therefore, this section should not be construed to grant an exclusive franchise in the streets, or to prevent a city from establishing and operating such public waterworks or lightworks, notwithstanding the fact that private persons or corporations are using the streets in operating works of the same kind.

In the Knoxville case the city had stipulated that it would not grant a similar franchise to any other person. Yet it was held that the city was at liberty to establish and operate municipal works, regardless of the effect thereof on the grantee of the franchise. The other cases cited are to the same effect.

The exact point here involved was decided by the United States circuit court for the southern district of California in *Madera Waterworks* v. *Madera*, 185 Fed. 281, decided by Wellborn, J., on September 12, 1910. It was there held that after private capital has, in a city of this state where there are no municipal waterworks, laid its mains and pipes in the streets in pursuance of the constitutional grant, and while it continues to operate such works, the city itself may install and operate similar works in competition with the private works. The opinion is elaborate and exhaustive and it satisfactorily establishes the proposition.

The statement in section 22 of article I, that the provisions of the constitution are mandatory and prohibitory, does not require a different interpretation of section 19 of article XI. It refers to the effect, not to the meaning of the constitutional provisions, and declares that they are imperative and para-mount, according to their true meaning, ascertained by the

rules of construction otherwise applicable thereto. Section 22, as is well known, was inserted because of certain previous decisions holding that the provisions of the constitution of 1849 regarding the titles of legislative acts were directory and not mandatory. (*Washington* v. *Page*, 4 Cal. 388; *Ex parte Newman*, 9 Cal. 523; *Pierpont* v. *Crouch*, 10 Cal. 315; *In re Boston M. Co.*, 51 Cal. 626.) As there is no declaration, express or implied, in section 19, that cities shall not establish competing works, and use the public streets for that purpose, there is nothing on that point to which section 22 of article I can be applied.

It is suggested that from the fact that the right to use the streets is offered only in cities having no municipal works, an implication or inference arises that the city shall not establish municipal works after the constitutional offer to private parties has been accepted and used. The rule above stated, that nothing is to be taken by implication against public rights, that the public authorities will not be deemed to have been deprived of rights or powers unless the intent to that effect clearly appears, is a sufficient answer to this suggestion.

5. It is argued that the proceedings are void because the question voted on included two distinct and separate objects or purposes, while the law allows but one to be submitted. Conceding, for argument's sake, that the constitution (sec. 18, art. XI) and the Bond Act (Stats. 1907, p. 609) require that each question submitted to a vote shall specify a single object or purpose, only, as the thing for which the proposed indebtedness is to be incurred, we are of the opinion that the question, as submitted, does not transgress such rule. The question, as printed on the ballot, was as follows:—

"Shall the city of Los Angeles incur a bonded debt of $3,500,000 for the purpose of acquiring and constructing a certain revenue producing municipal improvement, to wit: works for generating and distributing electricity for the purpose of supplying said city and its inhabitants with light, heat and power, including the acquisition of lands, water-rights, rights of way, machinery, apparatus and other property, and the construction of electric generating works, sub-stations, transmission and distributing lines, conduits and other works necessary therefor?"

This states but a single object and purpose—namely, the

establishment of the municipal improvement described. In order to accomplish this purpose and secure this object many things were, of course, necessary to be done and they are also stated in general terms in the question. But by the question stated the money obtained from the proposed bonds is not to be used for any of the physical objects mentioned in the more detailed description, unless they are necessary for the principal purpose and object—that is, the works for supplying the city and its inhabitants with electricity. The words "acquiring and constructing" do not express the dual purpose of acquiring one improvement of this kind and constructing another with the money obtained. They indicate the single purpose of acquiring all the property that may be found necessary for the proposed works, even including water-rights, and constructing works with said property.

To hold that the city must submit in one question the proposition to construct the electrical works and in another question, to be voted on separately, the proposition to acquire the property necessary to be used in such construction, would be to hold that the people might by one vote authorize the construction of the plant, and by the other defeat it by refusing authority to buy the property necessary for that purpose. It is practically imperative that the question put should include in one proposition everything necessary for the improvement.

There is no provision of the Bond Act, or of the constitution, which requires that the question shall state the precise location of the works to be provided out of the fund voted, or that they should be within the city limits. In the nature of things the construction of waterworks would require a large part of them to be situated outside of the city limits, and the city authorities must be given a wide discretion as to the location of public works in many cases, even after the money is obtained on the bonds. The question states the purpose with sufficient detail and certainty.

6. It is objected that the proposition submitted does not state when the bonds shall become payable. We find nothing in the constitution or act aforesaid which requires the time of maturity of the bonds to be stated in the question voted on, or to be decided by the vote of the people. Section 5 of the act provides that the city council shall determine that question, and it plainly contemplates that it may be done either

before or after the vote of the people is taken on the issuance of the bonds, and without action thereon by the people.

7. The objection that the council, before calling the election, did not make an estimate of the cost of the proposed improvement, is not sustained by the record. Section 2 of the Bond Act requires that the ordinance calling the election shall recite "the estimated cost of the proposed public improvements," and the provisions of the section authorize a bond issue when the cost of the improvement is too great to be paid out of ordinary annual revenues of the city. Both the original resolution of intention to establish the improvement and the ordinance calling the election declare that the estimated cost of the proposed improvement was three million five hundred thousand dollars. This was a sufficient compliance with the statute. It will be presumed from this recital that the council did previously make the estimate stated.

8. Another objection is that the publication of the ordinance was insufficient because it was not preceded by words in black-face type describing in general terms the purport or character of the notice intended to be given, as directed by section 4459 of the Political Code. (See *Derby* v. *Modesto,* 104 Cal. 523, 38 Pac. 900].) The ordinance was preceded by its title, which clearly described its purport. We do not regard the fact that it was not printed in black-face type of sufficient importance to warrant a holding that the proceedings were thereby invalidated, even if the section cited was applicable to the election notice in question, which we do not decide.

With regard to the points numbered 6, 7, and 8, it may be further remarked that even if the proceedings in the particulars mentioned had been irregular as claimed, they would be validated by the act of the legislature of March 21, 1911, (chap. 234, Stats. 1911). That act expressly declares that all bond issues irregularly authorized by any municipality in the state shall be valid, notwithstanding such irregularity or defect, if they have, at the election called for that purpose, received a two-thirds vote of the electors voting thereon. (*Chase* v. *Trout,* 146 Cal. 358, [80 Pac. 81].)

9. Lastly, it is contended that the proposed bond issue is invalid because the amount thereof exceeds the limit of indebtedness allowed by the city charter. It appears that at the same election, and by the same ordinance, there was submitted to

the voters of the city a proposition to issue bonds to the amount of three million dollars to defray the cost of certain harbor improvements which the city proposed to make at Wilmington harbor, within the city, and that this proposition also carried. At the time of the election the charter of the city provided that the indebtedness of the city, exclusive of debts for waterworks, sewers, and storm drains, "must not exceed the sum of five million dollars." The indebtedness previously existing exclusive of that for waterworks, sewers, and storm drains, was $1,324,600. The bonds for the electric works would bring the indebtedness up to $4,824,600, which is a little below the limit. But if the harbor bonds are added, the total amount would exceed the limit. As both were carried by the people at the same election, it would be difficult to say that one preceded the other, or that the people preferred one to the other, so as to determine which should be declared valid in preference to the other. There were four hundred and six more votes in favor of the electric works bonds, and three hundred less votes against them, than upon the harbor bond proposition, in a total of 14,041. We are not prepared to say that this would suffice to make the electric works bonds valid and the harbor bonds void. We find it unnecessary, in view of a subsequent amendment of the city charter, to determine this question.

On March 6, 1911, an amendment of the charter on this subject was submitted to the voters of the city and ratified by them, and on March 20, 1911, the same was duly approved by the legislature. This amendment provides that for the purpose of acquiring, constructing, or completing electric-light and power works, and certain other specified purposes, the city may incur an indebtedness not exceeding twelve per centum of the assessed value of all taxable real and personal property within the city, in addition to three per cent allowed for certain other purposes. It is stipulated by the parties, as a fact to be considered in the decision of this appeal, that the total assessed value of the taxable property within the city in the year 1910 was $289,279,927, and that for the year 1911 it was $332,884,924. This places the proposed bonded debt far below the limit allowed by the amendment. The vote of the electors upon a proposition to issue bonds for municipal improvements does not *ipso facto* create a debt against the city to the amount

authorized. The indebtedness of the city is not thereby increased. The increase occurs when the bonds are issued and become valid obligations in the hands of the holders—that is, when they are sold and delivered to the purchaser. The provision of the charter, prior to the amendment, was that the indebtedness "must not exceed" five million dollars. It is obvious that this provision has not been violated, since the bonds here involved have not been issued and the city indebtedness has not been increased by reason thereof. It still remains only $1,324,600. From this it follows that if, at the time the bonds are issued and become lawful debts, they do not raise the indebtedness above the legal limit, as then established, they will not be deemed void because of the fact that at the time the vote authorizing them was taken, the amount voted would have exceeded the then existing limit. The authorities so declare. (*Frost* v. *Central City,* 134 Ky. 434, [120 S. W. 367] ; *Austin* v. *Valle,* (Tex. Civ. App.) 71 S. W. 414; *Dudley* v. *Lake,* 80 Fed. 677, [26 C. C. A. 82] ; *Corning* v. *Meade Co.,* 102 Fed. 57, [42 C. C. A. 154] ; *Board* v. *National L. I. Co.,* 94 Fed. 328, [36 C. C. A. 278] ; *Lake Co.* v. *Sutliff,* 97 Fed. 281, [38 C. C. A. 167].) The effect of the amendment, therefore, is to raise the limit existing at the time the vote was taken and to make the bonds valid if, at the time they are issued, they do not then increase the debt beyond the increased amount allowed. If the case had been submitted on appeal prior to the amendment of the charter aforesaid, the condition of the record at that time, and the then existing limit, would have required a decision with respect to the amount of the respective issues that could be considered valid. But the amendment of the charter has the effect of law and is a matter of judicial knowledge. The stipulation of the fact as to the assessed valuations enables us to decide the case according to the law as it now exists and thereby to avoid the necessity for further litigation concerning the validity of the bond issues. They have not been issued and are not existing debts of the city. They do not exceed the present limit of indebtedness, and hence, so far as that objection is concerned, they are valid.

This includes all the points urged in the briefs. We find no ground for declaring the bonds invalid.

The judgment is affirmed.

Angellotti, J., Sloss, J., Melvin, J., Lorigan, J., and Henshaw, J., concurred.

Rehearing denied.

In denying a rehearing the court in Bank rendered the following opinion on June 30, 1911:—

THE COURT.—A petition for rehearing has been presented by certain persons as *amici curiæ* on behalf of corporations engaged in supplying electricity to the inhabitants of Los Angeles. We briefly notice the arguments therein not considered in the opinion heretofore filed.

1. It is contended that the business of supplying electricity for *motive power* is a private business not within the scope of municipal purposes for which, under the constitution, municipal corporations may be organized as provided in sections 6 and 8 of article XI. We can see no ground for any distinction in this respect between the use of electricity for power and its use for heat and light, for which purposes counsel admit that cities may distribute it if authorized by law. It has come to be in common use in homes for the operation of light machines such as sewing-machines and suction-cleaners, and its supply for this use is also conceded to be a proper municipal purpose. The fact that it may also be furnished to persons desiring to apply it to larger machines for manufacturing or other business purposes is no sound reason for holding such distribution to be without the scope of municipal powers. The business of supplying water for irrigation, or for the watering of stock, is a purely business purpose, as distinguished from domestic use, but it has always been recognized as a public service in which cities may engage. Electricity for power comes within the same category. The legislature has recognized this fact and has granted the power of eminent domain to persons and corporations proposing to supply electricity for general use for power. (Code Civ. Proc., sec. 1238.) The following from the opinion of this court in *Platt v. San Francisco*, 158 Cal. 74, [110 Pac. 307], is applicable generally to all such purposes: "There is no provision of our state constitution which either expressly or by implication forbids the acquisition, ownership, or operation of any such

public utilities by a municipality, or prohibits the granting to a municipality of the power to acquire, own and operate them."

2. With respect to the proposition that section 19 of article XI of the constitution, by necessary implication, forbids the granting of power to cities to engage in such public service where there are private systems of like kind already in operation, little need be said in addition to what we have said in the previous opinion. The purpose of the section was to prevent monopolies in the use of the streets for such purposes. It does not purport to grant the right to engage in the business of furnishing water, gas, or electricity for general use. It presupposes such power or right, and it merely gives the company or person having it the privilege of using the public streets as a way for its conduits. Cities have no inherent power to engage in administering such public utilities. They obtain such power by grant from the state. There is nothing in the language of section 19, or in the object which it was intended to accomplish,—namely, to prevent the giving of the exclusive use of the streets to private persons or companies,—which indicates that it was intended by that section to qualify or limit the power of the legislature to confer upon cities the power to engage in such business, or any business properly within the scope of municipal purposes.

3. In support of the proposition that the question, as stated on the ballot used at the election, included two distinct and separate purposes, the petition cites *Leavenworth* v. *Wilson,* 69 Kan. 74, [76 Pac. 400] ; *Elyria etc. Co.* v. *Elyria,* 57 Ohio St. 374, [49 N. E. 335] ; and *Neacy* v. *Milwaukee,* 142 Wis. 590, [126 N. W. 8], to the effect that a proposal to issue bonds to "purchase and erect," or "to purchase or erect," public works, is a proposal for a dual purpose. These decisions merely represent one side of a conflict of authority. The following cases hold the contrary: *Farmer's etc. Co.* v. *Sioux Falls,* 136 Fed. 732, [69 C. C. A. 373] ; *Nash* v. *Council Bluffs,* 174 Fed. 182; *Thomas* v. *Grand Junction,* 13 Colo. App. 90, [56 Pac. 665] ; *State* v. *Allen,* 178 Mo. 555, [77 S. W. 868] ; *State* v. *Allen,* 183 Mo. 283, [82 S. W. 103]. In this state the more liberal rule has been followed. (*People* v. *Counts,* 89 Cal. 15, [26 Pac. 612] ; *Oakland* v. *Thompson,* 151 Cal. 576, [91 Pac. 387].) It is not correct to say that the expression, "ac-

quiring and constructing a certain revenue producing municipal improvement," particularly described, is necessarily a statement of a dual purpose. The word "acquire" has a broad meaning, including both purchase and construction. The expression does not indicate the purpose of acquiring two systems, one by purchase, the other by construction. In connection with the context, it means the acquisition of but one system, including the purchase of such property and the erection of such structures as may be necessary to accomplish that purpose.

The petition for rehearing is denied.